CASE 47—INDICTMENT AND CONVICTION FOR MURDER—MARCH 28.

## Barnes v. Commonwealth.

APPEAL FROM NELSON CIRCUIT COURT.

·CHANGE OF VENUE—HOMICIDE—INSTRUCTION AS TO SELF DEFENSE—RIGHT OF JUDGE TO STRIKE JUROR FROM LIST—DYING DECLARATIONS.

Held: 1. Some discretion must be left to the trial court in acting upon an application for a change of venue, and, there being no abuse of discretion in refusing the application, there can be no reversal on that account.

2. Upon a trial for murder, it was not error to instruct the jury that they could acquit on the ground of self-defense only in the event they believed that defendant believed, and had reasonable

Barnes v. Commonwealth.

grounds for believing, that he had no safe means of "averting" the danger, except by shooting deceased; the word "averting" not being equivalent to "escaping."

3. If the trial judge is informed, by what he deems credible evidence, that a juror, for any reason, is not qualified to try the case, it is proper for him to strike the juror's name from the list.

4 The statement of deceased that his wound would kill him, which was made in connection with a declaration by him as to the circumstances of the shooting, does not show such a sense of impending death as to make his declaration admissible as a dying declaration.

JOHN S. KELLY AND JOHN D. WICKLIFFE, ATTORNEYS FOR APPELLANT.

ROBT. J. BRECKINRIDGE, ATTORNEY-GENERAL, FOR APPELLEE.

(No briefs in the record.)

OPINION OF THE COURT BY JUDGE GUFFY—REVERSING.

The appellant was indicted in the Nelson Circuit Court for the murder of W. B. Nicholls, and upon trial of the charge he was found guilty of murder, and sentenced to the penitentiary for life, and, his motion for a new trial having been overruled, he prosecutes this appeal.

It appears from the testimony that appellant and deceased lived near together in Nelson county, and prior to the 20th of November, 1899, had been on friendly terms. On the 20th of November, 1899, they met in Bardstown, in the store of one Losson. It so happened that some conversation occurred between them concerning the recent election, in which it is evident that some harsh words were used by the deceased, and there is evidence conducing to show that appellant either said or did something likely to irritate the deceased. The evidence also conduces to show that deceased and Losson were in friendly conversation in the store before appellant came in. After the trouble between appellant and deceased, appellant left the

store, and pretty soon thereafter deceased, in company with his friend, Smith, also left; and it is the contention of appellant that deceased and Smith followed him to several places in town, the theory of appellant being that they were seeking an opportunity to injure him or renew the difficulty. This, however, is denied by Smith, and it nowhere appears that any other words passed between them in town. It is claimed by appellant that deceased was heard to say, in substance, "We will get him as he goes home." The evidence shows that appellant obtained a pistol from a relative in town, and also bought three cartridges at a store. Some time in the afternoon appellant left for home, riding a mule, and not long afterwards deceased and Smith left, apparently for home, riding in a buggy, and some distance from town they overtook appellant, and shortly afterwards Barnes shot the deceased with a pistol, from which shooting deceased died next morning. As to what occurred when appellant was overtaken, the testimony of Smith and of appellant is quite contradictory. They are the only living persons who were present, or saw the difficulty which resulted in the death of deceased. We deem it entirely unnecessary to state either the evidence of Smith or appellant, for the reason that it was for the jury to weigh and determine the testimony. The appellant relied on ten grounds for reversal.

At the May term, 1900, of said court, appellant moved for a change of venue, which was resisted by the Commonwealth, and considerable amount of testimony was introduced for and aginst the motion. The court finally overruled the motion, and of that appellant complains. Some discretion as to change of venue must necessarily be exercised by the trial court, and in this instance we are not

Barnes v. Commonwealth.

prepared to say that under the evidence introduced, the trial court erred in overruling the motion.

It is earnestly contended for appellant that the court misinstructed the jury in giving instructions 1, 2, 3, and 5. Nos. 1, 2, and 3, it seems to us, are in the form generally given in such cases. No. 5 reads as follows: "If they believe from the evidence that at the time he shot W. B. Nicholls with a pistol, if he did shoot him, the defendant believed, and had reasonable grounds for believing, that he was then in immediate danger of loss of life, or of receiving great bodily harm at the hands of said Nicholls, and believed, and had reasonable grounds for believeing, he had no apparent and safe means of averting said danger except by shooting said Nicholls, he is excusable on the ground of self-defense, and they should find him not guilty." It is argued that the word "averting" should not have been inserted in the instruction; that it is equivalent to the word "escape" or "escaping," and that this court has heretofore decided that the word "escape" should not be used in such cases, for the reason that it is liable to be understood as requiring the defendant to flee, retreat, or run away. Mr. Webster defines "avert" as follows: "To turn aside or away; as, to avert the eye from an object; to ward off or prevent the occurrence or effects of; as, 'how can the danger be averted?' 'To avert his ire.'" It will thus be seen that the term used in the instruction could not fairly be understood as requiring the defendant to retreat or run away, and it is therefore unobjectionable; for it will be seen that, unless he had apparent and safe means of averting the danger, he was excusable for acting in his own self-defense. We are not of the opinion that the court erred in refusing the instructions asked by the defendant.

Appellant further complains, of misconduct of the jury

and of the Commonwealth's attorney. It is contended that
the jury were permitted to separate during the trial, and
considerable evidence was introduced in support of that
contention on the motion for a new trial. It is not neces-
sary to discuss the evidence in that regard, as upon the
next trial it must be presumed that nothing of the kind
will occur, if, in fact, it occurred upon the trial under con-
sideration; and the same may be said as to the complaint
of misconduct of the Commonwealth's attorney, which
misconduct was vigorously denied by the prosecution.

It may be conceded that accepting the affidavit of Clark
as to the qualification of Biven as a juror was out of
the ordinary, but it must also be conceded that if the judge
of the trial court is informed by what he deems credible
evidence, that a juror, for any reason, is not qualified to
try the case then under consideration, it is no more than
the duty of the judge to strike his name from the list.

We do not think the court erred in rejecting the testi-
mony offered by the appellant, and the same may be said as
to rejecting the testimony offered by the prosecution.

There is no necessity for discussing the question whether
or not Blanford was a housekeeper, and therefore a compe-
tent juror.

B. S. Lasley was introduced by the prosecution, and was
permitted to testify as to a conversation had with the de-
ceased after the shooting, and of this the appellant com-
plains. It is evident that the conversation was allowed to
be detailed upon the idea that it was the dying declaration
of the deceased, and that the deceased was then *in extremis*
so as to authorize it, and that he had abandoned all hope
of life. The testimony of Lasley shows that he was ac-
quainted with Nicholls, and that he saw him on the back
porch of George Harned's, where he was taken shortly

after the shooting.   In response to a question by the prose-
cution, he said: "He was lying there like he was asleep,
with his eyes closed.   He opened his eyes and noticed me,
though. Well, he told me, 'That fellow done me up; shot
me in the arm.' I told him to keep quiet; that the doctor
would be there pretty soon; may be he was not hurt so bad;
and he said he was shot in the side, 'What would kill
me.' I got him to hush talking about it, and after awhile
the doctor did come. When the doctor came, we pulled
off his vest, and tore his underclothes, so he could get to
the place, and he threw his hand over and said, 'As I told
you, he has shot me in the side.' Well, I didn't let him talk
any more than that, and, after the doctor got there and
dressed his wounds, Mr. Harned wanted him to move away
from there, and he asked the doctor if he would be able
to take him away from there, and after awhile the doctor
told him, if he had to be moved, he could take him away,
and George Bealmear said he would go down to his brother
Beck's and get a cot and some bed clothes, and take him
down to Mr. Beck's. He went down, and got a cot and
some bedclothes, and put him on it, and carried him down.
When we got down there we put him in a room there, and
he said to me there that it was all uncalled for." The
latter part of that statement, however, was excluded from
the jury. At this point the jury was withdrawn from
the room, and during their absence the competency of cer-
tain evidence to be offered by the witness was considered,
and, after the return of the jury, counsel for the prose-
cution said to witness, "Go ahead, and testify about the
matters the court has instructed you you could testify
about." The witness said: "I don't know that I could tell
what he said to me, if I am not allowed to tell what the wit-
ness told me. Q. Tell the jury everything except what

the court told you to leave out, Mr. Lasley. A. He told
me that that shot in the side— Q. Just tell now what
he said to you, and what took place when they met out
there,—when he and Barnes came together out there on
the road,—except leave out what the judge told you, A.
He said when he started out of town in the afternoon he
overtook Barnes on Buffalo Hill, and said the fuss was re-
newed; that Barnes rode ahead of him a few feet, and
jumped off, and drew his pistol when he came back, and
said, 'If trouble is what you are looking for, you can get it,'
and threw it down; and he said, 'I never did believe he was
going to shoot me.' "

The question under consideration has been so often
passed upon by this court that a discussion of the law ap-
plicable thereto seems to be unnecessary. We will, how-
ever, refer to a few cases. In Vaughan v. Com. 86 Ky.
431 (6 S. W., 153), 9 R., 644, we quote from the syllabus: "In
cases of homicide, the statements of the deceased as to the
killing are not admissible in evidence as his dying declara-
tion, unless it appears that they were made under a sense
of impending death. Something more must appear than a
mere belief upon the part of the deceased that he would ul-
timately die from his injuries. In this case the statement
of the deceased that he believed he would have to die was
nothing more than the expression of an opinion that the
wound he had received would ultimately cause his death
and was not sufficient to make his statements as to the
killing competent evidence." The most that could possibly
be claimed in the case at bar would be that the deceased
meant to express the opinion that the wound in his side
would at some time cause his death, and, taking the pecu-
liar expression as appearing in the bill of exceptions, we
are hardly authorized to conclude that the deceased really

Barnes v. Commonwealth.

expressed an opinion that the wound would cause his death. In Baker v. Com., 20 R., 1778, 50 S. W., 54, this court considered the question under discussion at considerable length, and quoted with apparent approval from Rice on Criminal Evidence (section 330), as follows: "This species of evidence is obviously liable to great abuse, and should be received with great caution, and only when a proper introduction entitles it to be received. The witness whose testimony is cast upon the record is beyond the reach of cross-examination; all opportunity for investigating the question of malice, enmity, positive identification, is lost forever; and the accused, whose tenure of life is hanging in the balance, has to contend with the additional disadvantage that a just indignation is aroused in the minds of the triors by the mere recital of a hideous crime. Evidence of this character is universally admitted, however, on the ground of necessity; and in order to prevent the entire frustration of justice, to impart competency to this evidence, it must clearly appear that the declarant was conscious of the imminency of death, believed himself to be beyond the probabilities of recovery, and this belief must be evident by some word or act of a conclusive and unmistakable character." It seems clear to us that the evidence of Lasley as to the statements of the deceased were incompetent. It does not at all appear that the deceased was so impressed with impending dissolution or so certain of speedy death as to render his statements competent evidence. It will hardly be questioned that the statements of deceased as detailed by the witnesses were material and highly prejudicial to the accused. The judgment is therefore reversed and cause remanded, with directions to set aside the verdict and judgment and award appellant a new trial, and for proceedings consistent herewith.